

FILED
SEP 25 2019
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN JACOB STAPLETON,<br><br>Defendant. | **UNDER SEAL**<br><br>Case No. 1:19-mj-416 (IDD) |

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Paul J. Fisher, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since August 2012. I am currently assigned to the FBI's Washington Field Office, Northern Virginia Resident Agency, and I work on a squad that investigates narcotics trafficking and criminal enterprises.

2. I have investigated violations of federal and state narcotics laws. I have conducted and participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors and seizure of controlled substances. Many of these investigations have involved the distribution and use of heroin, a Schedule I controlled substance. I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from both state and federal agencies. As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances, including cocaine, crack cocaine, methamphetamine, and heroin.

3. I have participated in the execution of numerous search warrants and have sworn to numerous affidavits in support of arrest warrants and search warrants for illegal narcotics,

paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, and records, ledgers, and documents pertaining to the purchase and sale of controlled substances.

4. This affidavit is being submitted in support of a criminal complaint and arrest warrant for JOHN JACOB STAPLETON ("STAPLETON") for his role in a conspiracy to distribute heroin, a Schedule I controlled substance, resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 841 and 846.

5. The information contained in this affidavit is based upon my personal knowledge of this investigation, as well as the observations of other law enforcement officers and information from confidential witnesses involved in this investigation. All observations referenced in this affidavit that were not personally made by me were related to me, directly or indirectly, by the persons who made such observations.

6. This investigation made use of cooperating individuals ("CIs"). Throughout this affidavit, all CIs will be referred to in the masculine regardless of actual gender.

7. Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant, it is not intended to include every fact and matter observed by me or known to the government. I have set forth only those facts necessary to support probable cause.

## PROBABLE CAUSE

8. In or around April 2016, the FBI, the Loudoun County Sheriff's Office ("LCSO") and the Leesburg Police Department ("LPD") began an investigation into STAPLETON's involvement in a conspiracy to distribute heroin in Loudoun County, Virginia, located in the Eastern District of Virginia. Throughout the investigation, law enforcement interviewed numerous

individuals, including but not limited to, Cooperating Individual-1 ("CI-1"),[1] CI-2,[2] and CI-3[3] regarding STAPLETON's involvement in the conspiracy and E.L.'s death.

## E.L.'s DEATH

9. On March 18, 2016, LCSO detectives responded to CI-1's residence in Round Hill, Virginia, in the Eastern District of Virginia, based on a reported death. At the scene, law enforcement discovered the body of the victim, E.L. There were no obvious signs of trauma. E.L.'s body was examined by a forensic pathologist and E.L.'s blood and vitreous humor[4] were examined by a forensic toxicologist. The forensic toxicologist determined that E.L.'s blood and vitreous humor each contained a combination of morphine and 6-acetylmorhpine. I know from my training and experience and involvement in this investigation that the presence of morphine and 6-acetylmorphine in blood and other bodily fluids indicate the use of heroin. Upon receiving

---

[1] CI-1 began cooperating with law enforcement in 2016 and pled guilty to obstructing justice in the Eastern District of Virginia in June 2017. CI-1 received a sentence reduction for cooperating with the government. Pursuant to the cooperation agreement, CI-1 is subject to breach if CI-1 provides false information. CI-1 is an admitted drug user and has past state misdemeanor and felony convictions for drug trafficking offenses. CI-1 has provided information that has led to the arrest and prosecution of other defendants. CI-1's information has been corroborated by law enforcement and has proven to be accurate. Based on the forgoing I consider CI-1 to be reliable.

[2] CI-2 has been cooperating with law enforcement since 2017. CI-2 has prior state drug convictions and probation violations. CI-2 is an admitted drug user. CI-2's information has been corroborated by law enforcement and has proven to be accurate. CI-2's information has led to the successful prosecution of others. Based on the forgoing, I consider CI-2 to be reliable.

[3] CI-3 has been cooperating since 2018 following his guilty plea to conspiracy to distribute heroin resulting in death in the Eastern District of Virginia. CI-3 has prior state felony and misdemeanor drug trafficking charges. CI-3's information has been corroborated by law enforcement and has proven to be accurate. Based on the forgoing, I consider CI-3 to be reliable.

[4] I know from my training and experience that vitreous humor is a fluid contained inside the eye. I further know from my training and experience that it is often tested along with blood in suspected overdose deaths to determine whether narcotics contributed to the serious bodily injury and death of the victim.

these results and comparing them to the other pathological findings, the forensic pathologist determined, on May 3, 2016, that E.L. died from accidental heroin poisoning. As part of my involvement in this investigation, I reviewed the results of E.L.'s autopsy and confirmed that this was his declared cause of death.

### INTERVIEW OF S.C.

10. On or about March 18, 2016, LCSO detectives spoke with E.L.'s sister, S.C. S.C. explained that she dropped E.L. off at work on March 17, 2016, and that she picked E.L. up from work later that evening. She further stated that she delivered E.L. to CI-1's residence in Round Hill, Virginia. S.C. stated that she provided E.L. with car rides because he did not have a driver's license. S.C. also explained that she feared E.L. was seeking to spend time with CI-1 so that they could use drugs together.

### INTERVIEWS OF CI-1

11. On March 18, 2016, LCSO detectives spoke with CI-1, who stated that E.L. and CI-1 were together on the evening of March 17, 2016. E.L. slept at CI-1's house that evening, and on March 18, 2016, CI-1 found E.L. dead in a guest bedroom in the residence and contacted emergency services.

12. LCSO detectives again interviewed CI-1 at his residence on March 21, 2016. CI-1 told LCSO detectives that E.L. asked CI-1 to purchase a user-quantity of heroin and provided CI-1 $175.00 for the purchase. CI-1 admitted that he arranged to buy heroin from STAPLETON. CI-1 recalled that he traveled with another individual (hereinafter, "CI-2") to Leesburg, Virginia, in the Eastern District of Virginia, to purchase heroin. CI-1 explained that he conducted the purchase with STAPLETON and went home where he provided the heroin to E.L. CI-1 explained that he woke up the following day and found E.L., unresponsive, on the bedroom floor. CI-1 and CI-2,

4

who was still at CI-1's house that morning, located E.L.'s phone and wallet. CI-1 admitted that he deleted text messages from E.L.'s phone and his (CI-1's) phone pertaining to the transaction.

13. LCSO detectives interviewed CI-1 again at his residence on March 29, 2016. CI-1 again admitted that he purchased heroin from STAPLETON the evening before E.L.'s death. CI-1 further added that an additional co-conspirator (hereinafter, "CI-3") accompanied STAPLETON and that the transaction took place in CI-3's car and in CI-3's neighborhood. CI-1 added that he and E.L. went to sleep at approximately 4:00 a.m. on March 18, 2016, after E.L. used the heroin. CI-1 recalled locating E.L in the late morning / early afternoon the same day. CI-1 admitted that he did not originally discuss CI-3's involvement in the transaction because CI-3 was dating one of CI-1's friends, and he did not want to implicate him.

14. CI-1 pled guilty to obstruction of justice on June 15, 2017. Law enforcement interviewed CI-1 on June 29, 2017. During that interview, CI-1 admitted that he contacted STAPLETON in an attempt to purchase heroin. CI-1 further admitted that on the day of the transaction STAPLETON told him "we're not gonna be back until later." CI-1 explained that he understood this to mean that STAPLETON and CI-3 would be back later that day with heroin. CI-1 further explained that STAPLETON contacted him later that day to let him know that they (STAPLETON and CI-3) were returning with heroin. According to CI-1, he and CI-2 drove to CI-3's neighborhood, where CI-1 purchased the heroin inside CI-3's vehicle. According to CI-1, STAPLETON and CI-3 were both inside the car. CI-1 purchased a quantity of heroin from STAPLETON while CI-3 watched. CI-1 admitted that he, CI-2, and E.L. all used the heroin at CI-1's residence. CI-1 again explained that he last saw E.L. alive around 4:00 a.m. following the purchase, and that he found him dead later that same day.

15. Law enforcement interviewed CI-1 again on July 18, 2018. CI-1 admitted to purchasing heroin from STAPLETON on several prior occasions. CI-1 noted that he usually paid STAPLETON $100 per gram. CI-1 also identified a photograph of STAPLETON.

### INTERVIEWS OF CI-2

16. Law enforcement interviewed CI-2 on March 18, 2016. During this initial interview, CI-2 denied knowing whether E.L. or CI-1 used narcotics immediately prior to E.L.'s death.

17. Law enforcement interviewed CI-2 again on March 21, 2016. In this interview, CI-2 admitted that he drove CI-1 to obtain drugs from CI-3 in Leesburg, Virginia. CI-2 further admitted that he saw CI-3's vehicle at the deal location in Leesburg. CI-2 also noted that there was another individual in CI-3's vehicle that CI-2 could not clearly see. CI-2 stated that CI-1 conducted the transaction inside CI-3's vehicle and that afterwards they returned to CI-1's home.

18. On or about August 31, 2017, law enforcement interviewed CI-2 again regarding his knowledge of the events leading up to E.L.'s death. CI-2 admitted that he drove himself and CI-1 to CI-3's neighborhood in Leesburg to conduct the transaction. CI-2 again recalled that he saw CI-3's vehicle arrive at the deal location and that CI-1 entered that vehicle to conduct the transaction. CI-2 recalled that when CI-1 exited CI-3's vehicle, he had heroin. CI-2 confirmed that he, CI-1, and E.L. used that same heroin at CI-1's residence later that evening. CI-2 further explained that the next day, he and CI-1 found E.L. dead. CI-2 specifically recalled that E.L.'s body was cold to the touch when he discovered him.

### INTERVIEW OF CI-3

19. On November 30, 2016, CI-3 pled guilty to conspiracy to distribute heroin resulting in the serious bodily injury and death of E.L. Following his plea, law enforcement interviewed

CI-3 about, *inter alia*, the events leading up to E.L.'s death. CI-3 admitted that he and STAPLETON regularly traveled together to obtain heroin from suppliers in Baltimore, Maryland. He further admitted that he and STAPLETON would pool their money so they could purchase at least 10 grams of heroin per trip. CI-3 estimated that he and STAPLETON made approximately 20 trips to acquire this quantity of heroin. CI-3 also admitted that he would occasionally direct customers to STAPLETON when he was unavailable.

20. CI-3 recalled the evening when he and STAPLETON traveled to Baltimore to obtain heroin, a portion of which STAPELTON thereafter provided to CI-1 inside his (CI-3's) car. CI-3 further recalled that he contacted CI-1 and told him to meet them (CI-3 and STAPLETON) in his (CI-3's) neighborhood to conduct the deal. CI-3 further recalled seeing CI-1 arrive in CI-2's car. CI-3 further recalled that STAPLETON drove his (CI-3's) car to the deal, and that CI-1 purchased approximately $300 worth of heroin from STAPLETON.

## EXAMINATION OF CI-3's CELLULAR TELEPHONE

21. In June 2018, law enforcement executed a search warrant on a cellular telephone belonging to CI-3. CI-3 saved the contact name "JOHN" in association with a telephone number ending in 5042. On April 19, 2017, Verizon Wireless responded to an administrative subpoena for subscriber information for the number ending in 5042. According to Verizon Wireless, that number was subscribed to "John Stapleton." The following communications were extracted from the cellular device:

22. On March 21, 2016, CI-3 and the telephone number ending in 5042, belonging to STAPLETON, exchanged the following text messages:

CI-3: Yo what u doin today

STAPLETON: I just left ur hood I was gonna hyu but my mom called for me---I'm wher fir a min then nothing

CI-3: What u doin

STAPLETON: not much

CI-3: I was tryin to go down again today

STAPLETON: I got like 1.5 I want to move before I go bk up

CI-3: So then no?

STAPLETON: I dunno it cld go in the next hr u know how it is I cld be looking to go later or it may b tin

CI-3: Is it the really good shit or the okay shit

STAPLETON: Fire

CI-3: I'm tryin to get back down there before the dude runs out of it

23.     Based on my training and experience and knowledge of this investigation, I believe that STAPLETON and CI-3 were discussing a potential trip to purchase heroin. Additionally, I believe STAPLETON was trying to sell 1.5 grams of heroin before traveling again, and that the heroin STAPLETON possessed was strong.

24.     On March 26, 2016, CI-3 and telephone number ending in 5042, belonging to STAPLETON, exchanged the following text messages:

STAPLETON: Yo hey I'm just getting up but I can come down now if ur looking to go

CI-3: All good. Ya c'mon

CI-3: What are u tryin to get

STAPLETON: I dunno 5

25. Based on my training and experience and knowledge of this investigation, I believe STAPLETON and CI-3 were discussing a future purchase of 5 grams of heroin.

26. On April 13, 2016, CI-3 and telephone number ending in 5042, belonging to STAPLETON, exchanged that following text messages:

CI-3: Yo. Omw to city now. If u leave now and meet me there u can throw down ur loot with me

CI-3: From jay

CI-3: I'll be there in a an hour

CI-3: I would suggest u jump on this

STAPLETON: Don't have any $ sorry

CI-3: U don't have to apologize. Was trying to do u a favor. Why don't u have any money

STAPLETON: Only have like a cpl hundred bucks atm waiting for a cpl checks to clear

CI-3: Aight

CI-3: If u got 220 u can get 2

STAPLETON: Ya I do fuck it I'll come up

27. Based on my training and experience and knowledge of this investigation, I believe STAPLETON and CI-3 were discussing a future purchase of 2 grams of heroin for $220.00. I also believe CI-3 referenced one of their Baltimore-based sources of supply: "jay."

## INTERVIEW OF JOHN STAPLETON

28. During the pendency of this investigation, I learned that STAPLETON suffered a medical emergency that required his hospitalization in South Florida. In July 2019, I directed a fellow FBI special agent to determine if STAPLETON was well enough to be interviewed and if so, to gauge his willingness to be interviewed. On or about July 17, 2019, an FBI Special Agent

9

interviewed STAPLETON at a Starbucks coffee shop in Port Saint Lucie, Florida. Before beginning the interview, the special agent informed STAPLETON that the interview was voluntary and that he was free to leave at any point. During that interview, STAPLETON admitted that his heroin usage caused him to experience a stroke, which required his hospitalization for several months. STAPLETON explained that he was working part-time at a pool service company owned by his girlfriend's father. STAPLETON also stated that he planned to open his own pool business in the future. STAPLETON further admitted that he knew CI-3 and that he met CI-3 through CI-3's girlfriend at a drug rehabilitation facility. STAPLETON admitted that CI-3 sold heroin and that he (STAPLETON) purchased heroin from him (CI-3) on several occasions. STAPLETON denied having ever sold drugs, pooling his money with others to purchase drugs, or traveling with CI-3 to obtain drugs. STAPLETON also denied knowing CI-1 or E.L.

## CONCLUSION

29. Based on the information provided in this affidavit, I submit that probable cause exists to believe that STAPLETON and others did unlawfully, knowingly, and intentionally combine, conspire, and agree with others to distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, resulting in the serious bodily injury and death of E.L., in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Paul J. Fisher, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me the 25th day of September, 2019.

/s/
Ivan D. Davis
**United States Magistrate Judge**