**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:18-CR-340 |
| v. | The Honorable Anthony J. Trenga |
| JOHN JACOB STAPLETON, | Trial: February 3, 2020 |
| *Defendant*. | |

**GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE AND LIMIT
CERTAIN ARGUMENTS, LINES OF QUESTIONING, AND EVIDENCE AT TRIAL**

The United States of America, by and through the undersigned, respectfully moves this Court *in limine* for an order excluding arguments, lines of questioning, and evidence at trial relating to the following: (1) the sexually explicit conversations and images involving Joseph Riley Curry (hereafter "Curry"); (2) the use of racial epithets in text messages and other communications by Curry and the Defendant; and (3) the Defendant's medical history.  Each of these categories of information should be excluded at trial because they are irrelevant to the charges against the Defendant and, even if relevant, would be unduly prejudicial.

**FACTUAL BACKGROUND**

In approximately early 2016, the Defendant and Curry met through Curry's then-girlfriend, D.T.  Shortly thereafter, the two began conspiring to obtain and distribute heroin by pooling their collective resources to gain access to suppliers in Baltimore, Maryland.  Specifically, Curry and the Defendant shared rides to Baltimore where they would meet with suppliers with whom Curry had connections.  Their main supplier at the time, described as UCC-1 in the indictment, would not agree to meet unless the transaction involved at least $500 to $1,000.  Thus, Curry and the Defendant agreed to combine their money to ensure their access to UCC-1's heroin, portions of which they would distribute for profit.

On March 17, 2016, Mallorie Pensabene (hereafter "Pensabene") was contacted by her friend E.L. who asked if she could get heroin for their shared use. Pensabene contacted the Defendant and asked if he could supply her with heroin. The Defendant agreed to do so later that evening after he and Curry returned from Baltimore.

Later that evening, Pensabene was joined at her home in Roundhill, Virginia, by E.L. and her friend Stephen Gant (hereafter "Gant"). Once they learned the Defendant and Curry were coming back from Baltimore, Gant drove Pensabene to meet the Defendant and Curry in Leesburg to conduct the deal. E.L. remained at Pensabene's home with her son. Gant and Pensabene drove to a neighborhood in Leesburg near where Curry lived. Curry and the Defendant eventually arrived, driving Curry's vehicle. Pensabene entered Curry's vehicle and purchased approximately $275 worth of heroin from the Defendant. Pensabene and Gant then drove back to Pensabene's home where they, along with E.L., began using that same heroin. Pensabene injected herself while Gant and E.L. ingested the heroin nasally. In the early morning hours of March 18, 2016, Pensabene and Gant watched E.L. enter the guest bedroom to go to sleep.

Pensabene woke up the next day and checked the guest bedroom, where she found E.L. dead on the floor next to the bed. She called out to Gant for assistance. Gant came and checked E.L. for a pulse. His body was cold and he was not breathing. Realizing E.L. was dead, Pensabene deleted text messages from her cellular telephone and his that showed she helped him obtain heroin. Gant called 9-11 to report E.L.'s death. Following an autopsy, a forensic pathologist determined that E.L. died from heroin poisoning.[1]

---

[1] The government provided the Certificate of Analysis and Repot of Autopsy to newly retained counsel on December 26, 2019. They can be found between Bates Range US-00007919 to US-

2

Pensabene and Gant both agreed to cooperate with law enforcement's investigation of the Defendant and Curry. Pensabene admitted that she purchased the heroin that caused E.L.'s death from the Defendant inside Curry's vehicle. Gant admitted that he drove Pensabene to the deal where he saw Pensabene get inside Curry's vehicle to make the purchase. Although the deal took place at night and he remained in his own car during the transaction, Gant stated that he could see two people inside Curry's vehicle before Pensabene got inside.

On April 19, 2018, law enforcement obtained a search warrant for Curry's Facebook account, which revealed numerous communications related to his and the Defendant's drug-trafficking activities.[2] For example, on July 7, 2017, Curry wrote a Facebook message to D.T. discussing Pensabene. He said of Pensabene, in part,

> [s]he informed on some people. She was originally charged with the death of that dude and her and her lawyer did what the[y] could to instead get the charge put on John. But they couldn't for whatever reason so she just tried to set him up on a dope deal but he wouldn't answer her calls because he said she's annoying and he doesn't like her lol. So he lucked out on that one. . . . So she was snitching on people and could have on me easily but didn't. Strange.

However, many of the other messages were irrelevant and/or were with Curry's girlfriend and were sexual in nature. In some messages, Curry used racial epithets.

On May 25, 2018, law enforcement executed a search warrant at Curry's residence in Leesburg, Virginia, to recover Curry's cellular telephone. Curry's mother identified Curry's

---

00007926. In that same production, counsel was also provided an independent findings of Dr. Stacy Hail, M.D., a medical toxicologist, who concluded that E.L. would not have died but for his use of heroin. That report can be found between Bates Range US-00006244 to US-00006266.

[2] The government provided Curry's complete account to newly retained counsel on December 26, 2019. It was provided in native format and can be found at Bates Range US-00005137. The account is 3,998 pages.

phone, which law enforcement then seized. Law enforcement searched that phone and found text messages between Curry and the Defendant. Many of those messages were discussions regarding their conspiracy to obtain and sell heroin. For example, in one chain of messages on March 27, 2016, Curry and the Defendant discussed different tactics for maximizing the value of their drug sales. At one point, the Defendant wrote "I feel like I'm apprenticing [.]"[3] In their discussions, Curry and the Defendant both used racial epithets.

On November 30, 2018, Curry pled guilty to conspiracy to distribute heroin, resulting in the serious bodily injury and death of E.L., in violation of 21 U.S.C. §§ 841 and 846. Curry agreed to cooperate in the government's investigation of others, including the Defendant. Curry admitted that he and the Defendant conspired to obtain and distribute heroin and that he witnessed the Defendant sell Pensabene the heroin that ultimately killed E.L. According to Curry, that heroin was originally provided by UCC-1.

During the pendency of its investigation into E.L.'s death, law enforcement learned that the Defendant was hospitalized due to a suspected heroin overdose. On July 17, 2019, law enforcement interviewed the Defendant in an attempt to verify the extent of his capacity. The Defendant agreed to meet an agent at a local coffee shop.[4] During the interview, the Defendant admitted that he had a stroke stemming from a heroin overdose. He further explained that he worked for his girlfriend's father in a part-time capacity and that he planned to open his own

---

[3] Communications between Curry and the Defendant derived found on Curry's cellular telephone were produced in discovery on December 26, 2019, and can be found between Bates Range US-00009119 and US-00009348.

[4] The FBI 302 detailing the content of this interview was provided to newly retained counsel in discovery on December 26, 2019. The report can be found between Bates Range US-00003830 to US-00003831.

business in the near future. He made other incriminating statements, including his admission to knowing Curry and that Curry was a heroin dealer.

Law enforcement interviewed the Defendant again on October 3, 2019, following his arrest.[5] During that interview, the Defendant admitted that he made trips with Curry to Baltimore to acquire heroin, and that he knew UCC-1. The Defendant admitted that he and Curry combined resources to purchase up to 10 grams of heroin per trip. The Defendant also verified his phone number and admitted that he participated in the drug-related communications obtained from Curry's cellular phone. For example, the Defendant was asked whether he sent a text message to Curry stating "I got like 1.5 I want to move before I go bk up[.]"[6] The defendant admitted that he wrote the communication and that "1.5" referred to grams of heroin. The Defendant also stated that when he wrote, "move" that he may have been referring to his own personal use.

## PROCEDURAL BACKGROUND

On September 25, 2019, the Defendant was charged by criminal complaint with one count of conspiracy to distribute heroin, resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 841 and 846. The Defendant was arrested in connection with the complaint on October 3, 2019, in Port St. Lucie, Florida. On November 12, 2019, a federal grand jury in the Eastern District of Virginia returned a two-count indictment charging him with: (1) conspiracy to

---

[5] The FBI 302 detailing the content of this interview was provided to newly retained counsel in discovery on December 26, 2019. The report can be found between Bates Range US-0009350 to US-00009354.

[6] Communications between Curry and the Defendant derived found on Curry's cellular telephone were produced in discovery on December 26, 2019, and can be found between Bates Range US-00009119 and US-00009348.

distribute 100 grams or more of heroin, resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 841 and 846; and (2) distribution of heroin, resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). The Defendant made his initial appearance in this District on November 26, 2019. The Defendant was arraigned on December 2, 2019. The Court scheduled trial to begin on February 3, 2020.

The Defendant originally requested court-appointed counsel. On December 2, 2019, the government provided the Defendant's appointed counsel with initial discovery. On December 11, 2019, the government conducted a reverse proffer with the Defendant where it explained the evidence it intended to introduce against him at trial and its understanding of the law governing the Defendant's charges. On December 17, 2019, the government extended a plea agreement and proposed statement of fact to the Defendant's appointed counsel.

On December 18, 2019, the Defendant's newly retained counsel filed a notice of appearance indicating his intention to appear *pro hac vice* on the Defendant's behalf. On December 19, 2019, the government provided the Defendant's newly retained counsel the same plea agreement and proposed statement of fact that it extended on December 17, 2019. On December 26, 2019, the government mailed discovery to the Defendant's counsel at his office in Fort Lauderdale, Florida, via U.S. Postal Service's certified mail. This discovery included Rule 16 matters as well as materials required under 18 U.S.C. § 3500 and *Giglio v. United States*, 405 U.S. 150 (1972).[7]

**ARGUMENT**

---

[7] According to the Discovery Order entered at arraignment, the government's deadline to provide *Jencks* and *Giglio* materials is January 29, 2020.

Each of the categories of evidence that the government seeks to exclude are irrelevant to the trial of the issues properly before the jury and are, accordingly, inadmissible under the Federal Rules of Evidence. In other words, the issues outlined above do not satisfy the most basic rule of evidence: Federal Rule of Evidence 402's requirement that proffered evidence must be relevant.

As the Court knows, evidence is relevant only if it tends to "make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. In guiding this analysis, the Court should look at the elements of the charged offenses.

To convict under 21 U.S.C. §§ 841 and 846 as charged in Count One, the jury must find three essential elements: (1) that the Defendant agreed with at least one person to distribute a controlled substance; (2) that the Defendant knew of the unlawful purpose of the agreement; and (3) the Defendant knowingly and voluntarily joined the agreement. *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010).

The government has alleged two additional aggravating elements in Count One. First, that the conspiracy involved at least 100 grams or more of heroin. Second, that death or serious bodily injury resulted from the use of heroin distributed by the conspiracy.

As to the first aggravated element, the defendant is accountable for the quantity of a controlled substance that he personally distributed, aided and abetted others to distribute, or that he could reasonably foresee that others would distribute during and in furtherance of the conspiracy. *United States v. Brooks*, 524 F.3d 549, 558 (4th Cir. 2008).

To prove that death or serious bodily injury resulted from the use of heroin provided by the conspiracy, the government must prove that heroin distributed by the conspiracy was the "but

for" or independently sufficient cause of the injury or death. *Burrage v. United States*, 134 S. Ct. 881, 892 (2014). The government need not prove that: the Defendant knew his distribution of heroin could cause death or serious bodily injury; that the Defendant intended to cause death or serious bodily injury; or that death or serious bodily injury were reasonably foreseeable consequences of the Defendant's conduct. *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994) (stating that 21 U.S.C. § 841 "puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute"); *United States v. Alvarado*, 816 F.3d 242, 250 (4th Cir.), *cert. denied*, 137 S. Ct. 492, (2016).

In Count Two, the Defendant is charged with distributing heroin, resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). To convict the Defendant of Count Two, the jury must find two essential elements: (1) that the Defendant knowingly and intentionally distributed or aided and abetted the distribution of a controlled substance; and (2) at the time of the distribution the Defendant knew that the substance distributed was a controlled substance. *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994).

As in Count One, the government has charged the Defendant in Count Two with the aggravated element of causing serious bodily injury and death. The government's burden on that element remains the same, with the caveat that the government must prove that heroin the Defendant distributed or whose distribution he aided and abetted was the but for or independently sufficient cause of death or serious bodily injury.

Evidence that does not assist the jury in making a determination regarding the elements of the offenses alleged in Counts One and Two should be excluded. As set forth more fully

8

below, each of the categories of evidence at issue in this motion will not assist the jury as factfinder.

Furthermore, even if the Court were to find that any of the categories of information addressed in this Motion were relevant, that information may still properly be excluded if the dangers associated with its introduction outweigh any probity. As the Court knows, Rule 403 allows the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403. Trial judges also have "wide latitude" to restrict cross-examination of witnesses for reasons beyond those outlined in Rule 403, including "concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Relevant evidence should be excluded "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008) (quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)). Excluding evidence that serves primarily to sway the jury's sympathies rather than to support the element-based determination properly in the province of the jury, should be excluded. As explained in further detail below, the evidence at issue in this motion, even if admissible, would primarily serve only these impermissible purposes.

**I.**     **Curry's sexually explicit Communications**

The United States moves the Court to preclude the Defendant from argument, questioning, or entering into evidence information regarding Curry's sexually explicit communications with intimate partners, such as his ex-girlfriend, D.T. These communications

are in no way related to the elements of the offenses alleged in the indictment. Further, they are not relevant to Curry's bias or motive to fabricate. Thus, they say nothing about his credibility and any argument or cross-examination related to those communications would do nothing but embarrass and harass Curry. Such evidence is entirely irrelevant and exceedingly prejudicial.

Even if the Court could find some fact of consequence for which evidence of Curry's sexually explicit communications with D.T. and others, could be relevant, such evidence falls squarely into the category of information that creates a genuine risk of exciting the emotions of the jury to irrational behavior. Therefore, even if the evidence were considered relevant, it should nevertheless be excluded under Federal Rule of Evidence 403 and pursuant to this Court's wide latitude in conducting a trial.

However, there are communications of a sexual nature between Curry and the Defendant related to their conspiracy to obtain and distribute heroin. For example, on March 26, 2016, Curry and the Defendant were discussing a woman in which the Defendant had a sexual interest. During the conversation, the Defendant wrote, "[y]a fo real I dunno if I need to say this. But I obv won't try to sell her any shit (she sounds like a cash cow re dope sales)[.]" In response, Curry wrote, "[s]he was def top notch clientele but I can afford to let her go" and "[g]o right ahead and sell her shit man. It will be a part of your allure to her." The Defendant responded, "[h]aha it'll be the main part re allure[.]" The government contends that those communications, and others like it, are relevant as evidence of the existence of the conspiracy charged in Count One, and are not simply sexually explicit communications that are of no additional evidentiary value. Therefore, the government asks that the Court's order not extend to communications between Curry and the Defendant that are relevant to show the existence of their conspiracy.

**II.    Evidence of Curry's use of racial epithets**

10

Evidence that Curry used racial epithets during communications with the Defendant and others is not relevant to any issue the jury must consider. As an initial matter, both Curry and the Defendant are white men. Moreover, a fulsome review of the Defendant's communications with Curry shows that they used similarly inappropriate racial slurs. As such, the Defendant cannot credibly argue that Curry's use racial epithets evidences his bias or prejudice towards him. *See Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Nevertheless, several relevant communications between the Defendant and Curry involve the use of racist language. For example, in one exchange on March 27, 2016, Curry said, "I've had ppl I don't know like demand to know weights and shit, they'll start acting all tough and demand to buy a gram and try to negotiate a price and shit and I just politely smile and tell em I got 40's take it or leave it yo[.]" In response, the Defendant said "[y]a fuck the hard talking niggas seems like if u give an inch in general ppl want a foot[.]"

The government submits that these communications, and others like them, are clearly relevant to show that the Defendant and Curry were involved in a conspiracy to distribute heroin, as charged in Count One. However, there is a risk that exposing the jury to racially charged language could excite its passions and distract it from its principle considerations. The government believes the interests of Rules 401, 402, and 403, are best served by redacting racial epithets—both Curry's and the Defendant's—from communications the government seeks to introduce during trial. Therefore, the government requests the Court preclude the Defendant from questioning, argument, or entering into evidence information regarding Curry's use of racial slurs, provided the government redact all such language, whether used by Curry or the Defendant, from its prospective exhibits. However, if the Court believes Curry's use of racial

11

epithets is relevant ground of cross-examination, the government requests that it be allowed to enter into evidence the Defendant's use of similar language.

### III. Evidence of the Defendant's medical conditions

The United States moves the Court to preclude the Defendant from argument, questioning, or entering into evidence information regarding the Defendant's past medical conditions. Such information is irrelevant to whether the Defendant conspired to distribute heroin with Curry, or whether he distributed, or aided and abetted the distribution of, heroin the use of which resulted in E.L.'s death. Similar to discussions of potential sentences,[8] presenting the jury with evidence or information regarding the Defendant's Florida overdose and stroke invites the jury to resolve the case based on something other than the evidence presented, i.e. jury nullification. *See United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (defense counsel not entitled to encourage jury nullification and court may take corrective action in the face of such attempt).

The only issue for which the Defendant's medical condition is relevant is his capacity to stand trial and participate in his own defense. 18 U.S.C. §§ 4241-42; *see also United States v. Basham*, 789 F.3d 358, 379 (4th Cir. 2015) (citing *Pate v. Robinson*, 383 U.S. 375, 384-86

---

[8] On January 2, 2020, the government filed a motion *in limine* seeking an order from the Court preclude the defendant or his counsel from arguing or presenting into evidence information about the Defendant's potential sentence if convicted of the offenses alleged in the indictment. Dkt. No. 30. Therein, the government argued, and reiterates here, that presenting the jury with information regarding a defendant's potential sentence is improper because it does not help the jury determine whether the government has met its burden to prove the elements of the offenses. *United States v. Meredith*, 824 F.2d 1418, 1429 (4th Cir. 1987); *United States v. Robinson*, 583 Fed. App'x 53, 54, (4th Cir. 2014) (citing *Rogers v. United States*, 422 U.S. 35, 40 (1975)). The introduction of such information would invite jury nullification, and the Court is entitled to take appropriate corrective action in the face of such an attempt. *United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996).

(1966)).  To that end, the government contends that there is no reason to believe that the Defendant is presently incapable of consulting with his counsel, nor is there reason to doubt that he is able to rationally and factually understand his case.  In fact, the Defendant demonstrated his knowledge of the individuals and events relevant to his charges during his interviews with law enforcement in Florida.

Since there is no issue at trial made more or less likely by the Defendant's medical conditions, the government asks the Court to grant the requested relief.

WHEREFORE, the government requests that this Court grant the relief requested herein.

                G. Zachary Terwilliger
                United States Attorney

By:       /s/
          David A. Peters
          Raj Parekh
          Assistant United States Attorneys
          United States Attorney's Office
          2100 Jamieson Avenue
          Alexandria, Virginia 22314
          Tel: (703) 299-3700
          Fax: (703) 299-3982
          David.Peters@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record. I provided an electronic copy of this motion to Counsel for the defendants.

                                                                         /s/
                                              David A. Peters
                                              Assistant United States Attorney
                                              United States Attorney's Office
                                              2100 Jamieson Avenue
                                              Alexandria, Virginia 22314
                                              (703) 299-3700
                                              David.Peters@usdoj.gov